M. Anderson Berry (SBN 262879)
aberry@justice4you.com
Gregory Haroutunian (SBN 330263)
gharoutunian@justice4you.com
**CLAYEO C. ARNOLD,**
**A PROFESSIONAL LAW CORP.**
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916)239-4778
Fax: (916) 924-1829

*Attorney for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| KATHRINE FINCH, individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| 49ERS ENTERPRISES, LLC dba THE SAN FRANCISCO 49ERS, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff Kathrine Finch ("Plaintiff") brings this Class Action Complaint against Defendant 49ers Enterprises, LLC dba The San Francisco 49ers ("Defendant"), in her individual capacity and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions and her counsels' investigations, and upon information and belief as to all other matters, as follows:

## I.  INTRODUCTION

1.      Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard the sensitive and confidential information that it collected and maintained for its pecuniary benefit – specifically, names, Social Security numbers, payment card information, and

1   information regarding National Football League employees' and their dependents' PII and

2   immigration statuses (collectively, "PII").

3       2.      Defendant is a National Football League ("NFL") team located in Santa Clara

4   County, California that operates a professional football team for fans throughout the Bay Area and

5   across the world. Defendant is a highly sophisticated business enterprise worth billions of dollars,

6   and yet it neglected to take basic and necessary steps to ensure that the PII it collected from

7   consumers and NFL employees was effectively protected against the foreseeable threat of a

8   targeted data breach.

9       3.      On or about February 6, 2022, Defendant's servers were infected with ransomware

10  and cybercriminals were able to take control Defendant's computer network for nearly five days

11  (until February 11, 2022), leading to the exposure of the PII contained on that server (the "Data

12  Breach"). Defendant then failed to notify victims of the Data Breach that their PII had been

13  compromised for over half of a year, until August of 2022.

14      4.      By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiff and

15  Class Members, Defendant assumed legal and equitable duties to those individuals to protect and

16  safeguard that information from unauthorized access and intrusion and to timely notify Plaintiff

17  and Class Members in the event of a Data Breach.

18      5.      Defendant failed to adequately protect Plaintiff's and Class Members' PII and

19  seemingly failed to even encrypt or redact this highly sensitive information. This unencrypted,

20  unredacted PII was compromised due to Defendant's negligent and/or careless acts and omissions

21  and its utter failure to protect the sensitive, non-public data it maintained for its own pecuniary

22  benefit. Hackers targeted and obtained Plaintiff's and Class Members' PII because of its value in

23  exploiting and stealing the identities of Plaintiff and Class Members. As a result of Defendant's

24  failure to implement adequate data security protocols, the risk of fraud and identity theft to

25  impacted individuals will remain for their respective lifetimes.

26      6.      Plaintiff brings this action on behalf of all persons whose PII was compromised as

27  a result of Defendant's failure to: (i) adequately protect the PII of Plaintiff and Class Members;

28

(ii) warn Plaintiff and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts, at least, to negligence and violates federal and state statutes.

7.      Plaintiff and Class Members have suffered injuries as a result of Defendant's conduct. These injuries include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, and (iv) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

8.      Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the PII of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they are entitled to injunctive and other equitable relief.

## II.   PARTIES

### Plaintiff Kathrine Finch

9.      Plaintiff Finch is a resident and citizen of California, currently residing in Garden Grove, California. Ms. Finch received Defendant's Notice of Data Breach, dated August 31, 2022, shortly after that date. If Ms. Finch had known that Defendant would not adequately protect her PII, she would not have allowed Defendant access to this sensitive and private information.

*Defendant*

10.     Defendant 49ers Enterprises, LLC dba the San Francisco 49ers is a Delaware corporation registered to do business in California, with its principal place of business in Santa Clara, California.

### III.    JURISDICTION AND VENUE

11.     This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, less than two-thirds of the Class are citizens of California, and at least one Class Member is a citizen of a state different from Defendant to establish minimal diversity.

12.     The Northern District of California has personal jurisdiction over Defendant named in this action because Defendant is headquartered in this District and conducts substantial business in California and this District through its headquarters, offices, and affiliates.

13.     Venue is proper under 28 U.S.C. §1391(b) because Defendant is headquartered in this District and has caused harm to Plaintiff and Class Members residing in this District.

### IV.    DIVISIONAL ASSIGNMENT

14.     This Action is properly assigned to the San Jose Division of this District pursuant to N.D. Cal. L.R. 3-2, because Defendant maintains its principal place of business in Santa Clara, California, which is served by the San Jose Division of this District.

### V.    FACTUAL ALLEGATIONS

*Background*

15.     Defendant is a National Football League franchise located in San Francisco, California that was founded in 1950. The San Francisco 49ers are a highly successful, competent organization including, but not limited to their competitive successes (five Super Bowl championships) as well as their business successes (worth roughly $5.2 billion).

16.     Defendant monetizes its football team in numerous ways, including selling tickets for its eight or nine annual San Francisco 49ers games which take place in their team's stadium.

CLASS ACTION COMPLAINT

Tickets are generally sold one of two ways: either online or through the team box office. In the process of selling tickets to football fans, the Defendant also requires that these consumers provide PII (inclusive of payment card data ("PCD"), name and Social Security number).

17.   Plaintiff was employed from 2017 to 2020 by an NFL franchise. She was required by that franchise to supply her PII and did not authorize that franchise to share her PII with Defendant or any other entity or individual.

18.   Plaintiff and Class Members relied on the sophistication of Defendant to keep their PII confidential, securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members demand security to safeguard their PII.

19.   Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties.

20.   Defendant had obligations created by contract, industry standards, common law, and representations made to Plaintiff and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

21.   Plaintiff and Class Members provided their PII to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

***The Data Breach***

22.   Beginning on or about August 31, 2022, Defendant began sending Plaintiff and other current and former NFL employees and physicians, and their dependents, a *Notice of Data Breach* ("Notice"). Defendant informed the recipients of the notice that "We detected a network security incident involving our corporate IT network…. [W]e identified unauthorized access to and/or acquisition of certain files on our corporate network between February 6-11, 2022. The Notice further informed victims of the Data Breach that the PII exfiltrated in the Data Breach included names, Social Security numbers, and payment card numbers.

23.   In response to the Data Breach, Defendant directed Plaintiff and Class Members to

take action to mitigate their damages, including recommending that they should, "remain vigilant to the possibility of fraud by reviewing your financial account statements."

24.     Defendant did not disclose in the Notice that the Data Breach that it was targeted by a sophisticated ransomware gang known as Blackbyte or that Blackbyte had already published certain files that it exfiltrated during the Data Breach on the dark web.[1] Defendant's six-month delay in providing Notice of the Data Breach is compounded by the fact that Blackbyte is known to sell the PII it steals on the dark web.[2]

25.     The details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again have not been shared with Plaintiff and Class Members, who retain a vested interest in ensuring that their PII remains protected.

26.     If it has not yet already, the unencrypted PII of Plaintiff and Class Members likely will end up for sale on the dark web or fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. As a result of its publication on the dark web and the fact that it is in the hands of criminals known to sell PII, unauthorized individuals can easily access the PII of Plaintiff and Class Members.

27.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining on Plaintiff and Class Members, such as encrypting the information or deleting it when it is no longer needed.

28.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[3]

29.     To prevent and detect cyber-attacks and/or ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following

---

[1] https://www.bleepingcomputer.com/news/security/san-francisco-49ers-blackbyte-ransomware-gang-stole-info-of-20k-people/ (last visited Jan. 6, 2023).

[2] *Id.*

[3] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited 1/6/23).

measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[4]

---

[4]     *Id.* at 3-4.

30.     To prevent and detect cyber-attacks Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[5]

---

[5]     *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at:* https://us-cert.cisa.gov/ncas/tips/ST19-001 (last visited Jan. 6, 2023).

31.     To prevent and detect cyber-attacks or ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[6]

---

[6]     *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Jan. 6, 2023).

CLASS ACTION COMPLAINT

32.     Given that Defendant was storing the PII of its current and former consumers, NFL employees and their dependents, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

33.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the PII of over 20,000 people, including Plaintiff and Class Members.

### *Defendant Acquires, Collects, and Stores the PII of Plaintiff and Class Members.*

34.     Defendant has historically acquired, collected, and stored the PII of Plaintiff and Class Members. In fact, NFL teams have recently recognized the value they can extract from PII and have amplified their efforts to collect and monetize that data.[7] The NFL currently holds PII on at least 120 million Americans, roughly one third of the country's population. Since 2014, the 49ers in particular have focused on efforts to collect consumer data by engaging through social media promotions, offering fan incentives, and other efforts.[8]

35.     As a condition of employment, Plaintiff and Class Members are required to give their sensitive and confidential PII to the relevant NFL franchise, and the franchise and Defendant retain and use the PII to boost revenue.

36.     As a condition of employment with and/or providing their labor services to Defendant, Plaintiff and Class Members are required to give their sensitive and confidential PII to Defendant. Often, this information can also encompass the PII of family members and dependents. Defendant retains this information.

37.     By collecting and using NFL employee and consumer PII for its own pecuniary benefit, Defendant was obliged to protect that data from unauthorized access from its network.

---

[7] https://www.sportsbusinessjournal.com/Journal/Issues/2021/08/02/Upfront/NFL-database.aspx (last visited Jan. 6, 2023).

[8] https://www.datanami.com/2014/07/28/nfls-49ers-launch-data-drive-boost-fan-base/ (last visited Jan. 6, 2023).

38.     By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting the PII from disclosure.

39.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

40.     Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the PII of Plaintiff and Class Members.

41.     Upon information and belief, Defendant made promises to Plaintiff and Class Members to maintain and protect PII, demonstrating an understanding of the importance of securing PII, including by way of the Defendant's privacy policy.

42.     Defendant's negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

43.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

***This Data Breach was Foreseeable***

44.     It is common knowledge in Defendant's industry that businesses that collect and maintain PII face a higher threat of security breaches due in part to the nature of the PII they possess.

45.     Additionally, as companies became more dependent on computer systems to run their business,[9] e.g., working remotely as a result of the Covid-19 pandemic, and the Internet of

---

[9] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html (last visited Jan. 6, 2023).

CLASS ACTION COMPLAINT

Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[10]

46.    As a custodian of PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

47.    In 2017, hackers breached the network of the NFL Players Association and exfiltrated the PII of roughly 1,200 players.[11] This attack used, as with the Data Breach here, ransomware as a means of attack. Accordingly, Defendant knew or should have known that it too was vulnerable to cyberattacks directed at the PII it maintains.

48.    Ransomware attacks, such as this one, are a well-known threat to companies that maintain PII. Companies should treat ransomware attacks as any other data breach incident because ransomware attacks don't just hold networks hostage, "ransomware groups sell stolen data in cybercriminal forums and dark web marketplaces for additional revenue."[12] As cybersecurity expert Emisoft warns, "[a]n absence of evidence of exfiltration should not be construed to be evidence of its absence [...] the initial assumption should be that data may have been exfiltrated."

49.    An   increasingly   prevalent   form   of   ransomware   attack   is   the "encryption+exfiltration" attack in which the attacker encrypts a network and exfiltrates the data

---

[10] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022 (last visited Jan. 6, 2023).

[11] https://www.forbes.com/sites/thomasbrewster/2017/10/03/colin-kaepernick-nfl-data-leaked-hackers-ransomware-threat/?sh=6abf93931767 (last visited Jan. 6, 2023).

[12] *Ransomware: The Data Exfiltration and Double Extortion Trends*, available at https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends (last visited Jan. 6, 2023).

contained within.[13] In 2020, over 50% of ransomware attackers exfiltrated data from a network before encrypting it.[14] Once the data is exfiltrated from a network, its confidential nature is destroyed and it should be "assume[d] it will be traded to other threat actors, sold, or held for a second/future extortion attempt."[15] And even where companies pay for the return of data, attackers often leak or sell the data regardless as there is no way to verify copies of the data are destroyed.[16]

50.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the PII that they collected and maintained would be targeted by cybercriminals.

51.     As a sophisticated institution that collects, utilizes, and stores particularly sensitive PII, Defendant was at all times fully aware of the increasing risks of cyber-attacks targeting the PII they controlled, and their obligation to protect the PII of Plaintiff and Class Members.

52.     Despite the prevalence of public announcements of data breaches and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

53.     At all relevant times, Defendant knew or should have known the unique value of the information in its possession, the importance of safeguarding Plaintiff's and Class Members'

---

[13] *The chance of data being stolen in a ransomware attack is greater than one in ten*, available at https://blog.emsisoft.com/en/36569/the-chance-of-data-being-stolen-in-a-ransomware-attack-is-greater-than-one-in-ten/ (last visited Jan. 6, 2023).

[14] 2020 Ransomware Marketplace Report, available at https://www.coveware.com/blog/q3-2020-ransomware-marketplace-report (last visited Jan. 6, 2023).

[15] *Id*.
[16] *Id*.

PII, and the foreseeable injuries that would occur if the security of Defendant's information system was breached, including the significant economic and noneconomic harms that victims of the Data Breach would suffer.

### *Value of Personally Identifiable Information*

54.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[17] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[18]

55.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, Personal Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[19] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[20] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[21]

---

[17]     17 C.F.R. § 248.201 (2013).

[18]     *Id.*

[19]     *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Jan. 6, 2023).

[20]     *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Apr. 29, 2022).

[21] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Jan. 6, 2023).

56.     An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[22] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[23][24] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[25]

57.     Social Security numbers, for example, are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[26]

58.     What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

59.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link

---

22  https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited 1/6/23).
23  https://datacoup.com/ (last visited Jan. 6, 2023).
24  https://digi.me/what-is-digime/ (last visited Jan. 6, 2023).
25  Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Jan. 6, 2023).
26  Social Security Administration, Identity Theft and Your Social Security Number, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Jan. 6, 2023).

the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[27]

60.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security number, name, and date of birth.

61.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[28]

62.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

63.     The fraudulent activity resulting from the Data Breach may not come to light for years.

64.     There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[29]

---

[27]   Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last visited Jan. 6, 2023).
[28] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Jan. 6, 2023).
[29]   *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited Jan. 6, 2023).

65.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, including Social Security numbers and payment card details, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

66.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

67.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to potentially thousands of individuals' detailed PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

68.     In the Notice letter, Defendant made an offer of 12 months of identity monitoring services. This is wholly inadequate to compensate Plaintiff and Class Members as it fails to provide for the fact victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' PII.

69.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

70.     The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

***Payment Card Data Breaches***

71.     In a debit or credit card purchase transaction, card data must flow through multiple systems and parties to be processed. Generally, the cardholder presents a credit or debit card to an e-commerce retailer (through an e-commerce website, like the one ShopRuger presents to

consumers) to pay for merchandise. The card is then "swiped" and information about the card and the purchase is stored in the retailer's computers and then transmitted to the acquirer or processor (i.e., the retailer's bank). The acquirer relays the transaction information to the payment card company, who then sends the information to the issuer (i.e., cardholder's bank). The issuer then notifies the payment card company of its decision to authorize or reject the transaction. The below graphic illustrates the process:

| # | Description |
|---|---|
| 1 | The consumer selects a card for payment. The cardholder data is entered into the merchant's payment system, which could be the point-of-sale (POS) terminal/software or an e-commerce website. |
| 2 | The card data is sent to an acquirer/payment processor, whose job it is to route the data through the payments system for processing. With e-commerce transactions, a "gateway" provider may provide the link from the merchant's website to the acquirer. |
| 3 | The acquirer/processor sends the data to the payment brand (e.g. Visa, MasterCard, American Express, etc.) who forward it to the issuing bank/issuing bank processor |
| 4 | The issuing bank/processor verifies that the card is legitimate, not reported lost or stolen, and that the account has the appropriate amount of credit/funds available to pay for the transaction. |
| 5 | If so, the issuer generates an authorization number and routes this number back to the card brand. With the authorization, the issuing bank agrees to fund the purchase on the consumer's behalf. |
| 6 | The card brand forwards the authorization code back to the acquirer/processor. |
| 7 | The acquirer/processor sends the authorization code back to the merchant. |
| 8 | The merchant concludes the sale with the customer. |

72.     There are two points in the payment process where sensitive cardholder data is at risk of being exposed or stolen: pre-authorization when the merchant has captured a consumer's data and it is waiting to be sent to the acquirer; and post-authorization when cardholder data has been sent back to the merchant with the authorization response from the acquirer, and it is placed into some form of storage in the merchant's servers.

73.     Encryption mitigates security weaknesses that exist when cardholder data has been stored, but not yet authorized, by using algorithmic schemes to transform plain text information

into a non-readable format called "ciphertext." By scrambling the payment card data the moment it is "swiped," hackers who steal the data are left with unreadable text in the place of payment card numbers with the cardholder's personal information stored in the retailer's computers.

74.     As evidenced by the payment card data exfiltrated in the Data Breach, Defendant failed to properly encrypt this data in line with industry standards.

### *Defendant Fails to Comply with FTC Guidelines*

75.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

76.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[30]

77.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[31]

---

[30]     *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Jan. 6, 2023).

[31] *Id.*

78.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

79.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

80.     Defendant failed to properly implement basic data security practices.

81.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

82.     Upon information and belief, Defendant was at all times fully aware of its obligation to protect the PII of their customers. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### *Defendant Failed to Comply with Industry Standards*

83.     Several best practices have been identified that at a minimum should be implemented by companies like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

84.     Other best cybersecurity practices that are standard in the Defendant's industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

85.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

86.     These foregoing frameworks are existing and applicable industry standards in Defendant's industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

### Plaintiff Finch's Experience

87.     Plaintiff Finch was required to provide and did provide her PII to Defendant.

88.     Plaintiff typically takes measures to protect her private information, and is very careful about sharing her PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

89.     Plaintiff stores any documents containing her PII in a safe and secure location. Moreover, she diligently chooses unique usernames and passwords for her online accounts.

90.     Shortly after August 31, 2022, Plaintiff received the Notice from Defendant informing her that her PII had been improperly accessed and/or obtained by unauthorized third parties. This notice indicated that Plaintiff's PII, including her name, date of birth, and Social Security number, was compromised as a result of the Data Breach.

91.     As a result of the Data Breach, and at the direction of Defendant's Notice letter, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to, researching the Data Breach; reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud; and researching the credit monitoring and identity theft protection services offered by Defendant and private companies. Plaintiff has spent significant time dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation.

92.     Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from Plaintiff; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

93.     As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come. Plaintiff and Class Members will need identity theft protection services and credit monitoring services for their respective lifetimes, considering the immutable nature of the PII at issue, which includes Social Security numbers.

## VI.  CLASS ALLEGATIONS

94.     Pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and/or 23(c)(5), Plaintiff brings this Action on behalf of herself and on behalf of all other persons similarly situated. Plaintiff proposes the following Class and Subclass definitions, subject to amendment as appropriate:

> **All individuals residing in the United States whose PII was compromised in the data breach first announced by Defendant on or about August 31, 2022 (the "Class").**

> **All individuals residing in California whose PII was compromised in the data breach first announced by Defendant on or about August 31, 2022 (the "California Subclass").**

95.     Collectively the Class and California Subclass are referred to as the Classes.

96.     Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

97.     Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

98.     This action is brought and may be maintained as a class action because there is a well-defined community of interest among many persons who comprise a readily ascertainable class. A well-defined community of interest exists to warrant class wide relief because Plaintiff and all members of the Classes were subjected to the same wrongful practices by Defendants, entitling them to the same relief.

99.     Numerosity: The members of the Classes are so numerous that joinder of all members is impracticable, if not completely impossible. At least 20,000 individuals were notified by Defendant of the Data Breach. The Classes are apparently identifiable within Defendant's records, and Defendant has already identified these individuals (as evidenced by sending them breach notification letters).

100.    Commonality: Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes. Among the questions of law and fact common to the Classes that predominate over questions which may affect individual Class members, including the following:

     a.   Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;

     b.   Whether Defendant had respective duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

1

2

    c.  Whether Defendant had respective duties not to use the PII of Plaintiff and Class Members for non-business purposes;

3

4

    d.  Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

5

    e.  Whether and when Defendant actually learned of the Data Breach;

6

7

    f.  Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

8

9

    g.  Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

10

11

12

    h.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

13

14

    i.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

15

16

    j.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and Class Members;

17

18

    k.  Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct;

19

20

    l.  Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

21

22

    m.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

23

24

25

    101.  Typicality: Plaintiff's claims are typical of those of the other members of the Classes because Plaintiff, like every other Class Member, were exposed to virtually identical conduct and now suffer from the same violations of the law as other members of the Classes.

26

27

    102.  Policies Generally Applicable to the Classes: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the

28

Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole and to the California Subclass as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Classes each as a whole, not on facts or law applicable only to Plaintiff.

103.    Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages he has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

104.    Superiority and Manageability: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

105.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources;

the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

106.   The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

107.   Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

108.   Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

109.   Further, Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Code of Civil Procedure § 382.

## <u>COUNT I</u>
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

110.   Plaintiff and the Class re-allege and incorporate paragraphs 1-110 as if fully set forth herein.

111.   As condition of either doing business as a consumer or of employment with the NFL and/or providing their labor services to the NFL and/or Defendant, Defendant's current and former consumers, current and former NFL employees (and their dependents) were obligated to provide Defendant with the sensitive PII referenced herein.

///

112.    Plaintiff and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

113.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

114.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

115.    Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that the PII of Plaintiff and the Class in Defendant's possession was adequately secured and protected.

116.    Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of the PII of Plaintiff and the Class.

117.    Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and the Class.

118.    Defendant was also subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class to safeguard the PII that it maintained.

119.    A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

120.    Plaintiff and the Class were the foreseeable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII, the critical importance of providing adequate security of that information, and the necessity for encrypting or redacting PII stored on Defendant's systems.

121.    Defendant's own conduct created a foreseeable risk of harm to Plaintiff and the Class. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein.  Defendant's misconduct also included its decisions to not comply with industry standards for the safekeeping of the PII of Plaintiff and the Class, including basic encryption techniques freely available to Defendant.

122.    Plaintiff and the Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

123.    Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

124.    Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

125. Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiff and the Class.

126.    Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

127.    Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiff and the Class by failing to implement industry standard protocols and exercise reasonable care in protecting and safeguarding the PII of Plaintiff and the Class during the time the PII and was within Defendant's possession or control.

128.    Defendant improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

129.    Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the PII of Plaintiff and the Class in the face of increased risk of theft.

130.    Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and the Class by failing to have appropriate procedures in place to detect and prevent improper disclosure and dissemination of PII in its possession.

131.    Defendant, through their actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiff and the Class the existence and scope of the Data Breach.

132.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

133.    There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and the Class and the present harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

134.    Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

135.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

136.    Defendant's violation of Section 5 of the FTC Act, as well as the standards of conduct established by these statutes and regulations, constitutes negligence *per se*.

137.    Plaintiff and the Class are within the class of persons that the FTC Act was intended to protect.

138.   The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

139.   As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual present and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the PII of Plaintiff and the Class; and (viii) costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and the Class.

140.   As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

141.   Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the PII in its continued possession.

142.     Plaintiff and Class Members are therefore entitled to damages, including actual and compensatory damages, restitution, declaratory and injunctive relief, and attorney fees, costs, and expenses.

### COUNT II
### INVASION OF PRIVACY
### (On Behalf of Plaintiff and the Class)

143.     Plaintiff and the Class re-allege and incorporate paragraphs 1-110 as if fully set forth herein.

144.     California established the right to privacy in Article I, Section 1 of the California Constitution.

145.     The State of California also recognizes the tort of Intrusion into Private Affairs, and adopts the formulation of that tort found in the Restatement (Second) of Torts, which states:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts § 652B (1977).

146.     Plaintiff and the Class had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

147.     Defendant owed a duty to current and former employees and physicians, including Plaintiff and the Class, to keep their PII contained as a part thereof, confidential.

148.     Defendant failed to protect and released to unknown and unauthorized third parties the PII of Plaintiff and the Class.

149.     Defendant allowed unauthorized and unknown third parties access to and examination of the PII of Plaintiff and the Class, by way of Defendant's failure to protect the PII.

150.     The unauthorized release to, custody of, and examination by unauthorized third parties of the PII of Plaintiff and the Class is highly offensive to a reasonable person.

151.     The intrusion was into a place or thing, which was private and is entitled to be private.  Plaintiff and the Class disclosed their PII to Defendant as part of their employment with

Defendant, but privately with an intention that the PII would be kept confidential and would be protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

152.    The Data Breach at the hands of Defendant constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

153.    Defendant acted with a knowing state of mind when they permitted the Data Breach to occur because they were with actual knowledge that its information security practices were inadequate and insufficient.

154.    Because Defendant acted with this knowing state of mind, they had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiff and the Class.

155.    As a proximate result of the above acts and omissions of Defendant, the PII of Plaintiff and the Class was disclosed to third parties without authorization, causing Plaintiff and the Class to suffer damages.

156.    Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class in that the PII maintained by Defendant can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and the Class have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and the Class.

**COUNT III**
**CALIFORNIA CONSUMER PRIVACY ACT ("CCPA")**
**Cal. Civ. Code § 1798.100, *et seq.***
**(On behalf of Plaintiff and the California Subclass)**

157.    Plaintiff and the Class re-allege and incorporate paragraphs 1-110 as if fully set forth herein.

158.    This Count is brought on behalf of Plaintiff and the California Subclass against Defendant.

159.    Defendants violated sections 1798.81.5(b) and 1798.150(a) of the CCPA, Cal. Civ. Code § 1798.150(a), by failing to prevent Plaintiff's and the California Subclass' PII from unauthorized access and exfiltration, theft, or disclosure as a result of Defendant's violations of their duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the PII.

160.    The non-redacted and non-encrypted PII of Plaintiff and the California Subclass was subjected to unauthorized access and exfiltration, theft, or disclosure as a direct and proximate result of Defendants' violations of their duty under the CCPA.

161.    Plaintiff and the California Subclass lost money or property, including but not limited to, the loss of legally protected interest in the confidentiality and privacy of their PII, nominal damages, and additional losses as a direct and proximate result of Defendants' acts described above.

162.    Defendant knew, or should have known, that their network computer systems and data security practices were inadequate to safeguard PII and that the risk of a data breach or theft was highly likely. Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect PII, such as properly encrypting the PII so in the event of a data breach an unauthorized third party cannot read the PII. As a result of the failure to implement reasonable security procedures and practices, the PII of Plaintiff and members of the California Subclass was exposed.

163.    The Private Information taken in the Data Breach is personal information as defined by Civil Code § 1798.81.5(d)(1)(A) because it contains Plaintiff's and the Class Members' unencrypted first and last names and Social Security numbers among other information.

164.    Defendant is organized for the profit or financial benefit of their owners and collect PII as defined in Cal. Civ. Code § 1798.140.

165.    Plaintiff and the Class Members are "consumer[s]" as defined by Civ. Code § 1798.140(g) because they are "natural person[s] who [are] California resident[s], as defined in

Section 17014 of Title 18 of the California Code of Regulations, as that section read on September 1, 2017."

166.    Plaintiff and the California Subclass seek injunctive or other equitable relief to ensure that Defendants hereinafter adequately safeguard PII by implementing reasonable security procedures and practices. This relief is important because Defendant still holds PII related to Plaintiff and the California Subclass. Plaintiff and the California Subclass have an interest in ensuring that their PII is reasonably protected.

167.    Pursuant to § 1798.150(b) of the CCPA, Plaintiff gave written notice to Defendant of their specific violations of sections 1798.81.5(b) and 1798.150(a) by email to outside counsel, by agreement, on January 6, 2023. If Defendant does not "actually cure" the effects of the Data Breach, which would require, at minimum, retrieving the PII or securing the PII from continuing and future use, within 30 days of delivery of the CCPA notice letter (which Plaintiff believes any such cure is not possible under these facts and circumstances), Plaintiff intends to amend this complaint to seek actual damages, or statutory damages of no less than $100 and up to $750 per customer record subject to the Data Breach, on behalf of the California Subclass.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.    For an Order certifying the Class and Subclass, as defined herein, and appointing Plaintiff and her Counsel to represent the Class and Subclass;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i.   prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.   requiring Defendant to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.   requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.   requiring Defendants to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiffs' and Class Members' respective lifetimes;

v.   requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

vi.   prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vii.   requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii.   requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix.   requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

x.   requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

xi.   requiring Defendant to conduct regular database scanning and securing checks;

xii.   requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xiii.   requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv.   requiring Defendant to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi.   requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential PII to third parties, as well as the steps affected individuals must take to protect themselves;

xvii.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands that this matter be tried before a jury.

Dated: January 10, 2023                         Respectfully Submitted,

*/s/ M. Anderson Berry*
M. Anderson Berry (SBN 262879)
aberry@justice4you.com
Gregory Haroutunian (SBN 330263)
gharoutunian@justice4you.com
CLAYEO C. ARNOLD,
A PROFESSIONAL LAW CORP.
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916)239-4778
Fax: (916) 924-1829

*Attorneys for Plaintiff and the Proposed Class*